Ilya SMIRNOV, et al., Appellants

v.

Hillary Rodham CLINTON, Secretary of State, et al., Appellees.

Nos. 11–5258, 12–5100.

United States Court of Appeals, District of Columbia Circuit.

July 3, 2012.

Ira Kurzban, Kurzban, Kurzban, Weinger, Tetzeli & Pratt PA, Miami, FL, for Appellants.

Hans Harris Chen, Wynne Patrick Kelly, Assistant U.S., R. Craig Lawrence, David J. Kline, Ronald C. Machen, Jr., Esquire, U.S., Tony West, U.S. Department of Justice, Washington, DC, for Appellees.

Before: GARLAND, BROWN, and GRIFFITH, Circuit Judges.

## JUDGMENT

PER CURIAM.

These consolidated appeals were considered on the record, briefs, and oral arguments of the parties. The court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* FED. R.APP. P. 36; D.C.CIR. R. 36(d). For the reasons stated below, it is

**ORDERED** and **ADJUDGED** that the district court's July 14, 2011 order dismissing the suit and its April 3, 2012 order denying the Rule 60(b) motion for relief from judgment be affirmed, and that Smirnov's motion for judicial notice be dismissed as moot.

This case stems from a regrettable error in the State Department's conduct of the fiscal year 2012 diversity visa lottery and its subsequent decision to void the results. Plaintiffs here are a group of those selected in that botched lottery. Ultimately, although we understand the plaintiffs' frustration and heartbreak, there is no legal theory entitling them to enforce the results of a lottery rendered unlawful by the Department's apparent negligence.

The diversity visa program is designed to encourage and facilitate immigration to the United States from historically underrepresented countries. Each year, 50,000 diversity visas are distributed "to eligible qualified immigrants strictly in a random order established by the Secretary of State." 8 U.S.C. § 1153(e)(2). The State Department promulgated regulations pursuant to this statute establishing an annual drawing known as the diversity visa lottery, which selects 100,000 winners who then have the opportunity to apply for one of the 50,000 visas.

The regulations require that the lottery be conducted in three steps. First, as petitions are received online during a thirty-day submission period they are "assigned a number in a separate numerical sequence for each regional area" specified by the statute. 22 C.F.R. § 42.33(c).[1] The initial numbers largely reflect the order in which petitions are received. Second, "all numbers assigned for each region will be separately rank-ordered at random by a computer using standard computer software for that purpose." *Id.* Third, the Department selects the appropriate quantity of petitions from the random "rank orders determined by the computer program." *Id.* The "winners" selected are considered for visas in the regional rank-order established by this process. *Id.* § 42.33(e). The program is extremely competitive: for the 2012 lottery, the Department received almost 15 million petitions.

The results of the first 2012 diversity visa lottery were posted online on May 1,

---

1. In order to encourage immigration from different areas the statute prescribes quotas for different geographic regions based on recent immigration statistics. *See* 8 U.S.C. § 1153(c)(1).

2011. But on May 5, the Department cut off access to its website in response to complaints that almost all of the winners had submitted their applications on October 5 or 6, 2010, the first two days of the submission period. Approximately 22,000 winners had already viewed the results. On May 13, the Department announced that the lottery results were invalid because they were not random as required by law, explaining that over 90% of the winners had been selected from the first two days of the registration period because of a "computer programming error." Compl. Ex. 2, at 1. It had previously guaranteed all applicants from each region an equal chance regardless of the day they submitted their petition. See 75 Fed.Reg. 60,846–02, 60,851 (Oct. 1, 2010). The Department announced it would conduct a second lottery and release the results on July 15, 2011.

On June 16, 2011, Ilya Smirnov filed suit on behalf of a putative class of the 22,000 winners who viewed the results before May 5. He sought an order to force the Department to honor the results of the first lottery and enjoin it from conducting another. The district court dismissed the action on July 14, 2011, finding the Department's actions were not arbitrary and capricious or contrary to law. *Smirnov v. Clinton,* 806 F.Supp.2d 1 (D.D.C.2011). The next day, the Department announced the results of the redrawn lottery, and most of the plaintiffs were not "winners" the second time around. Smirnov appealed.

██ We affirm the district court's conclusion that the Department acted reasonably in voiding the results of the first lottery and conducting a second. The first lottery was unlawful because it failed the regulation's requirement that the petitions be "rank-ordered at random" after the initial numbering is complete. See 22 C.F.R. § 42.33(c).[2]

Dr. Kirit Amin, the former director of the State Department's Office of Consular Systems and Technology, explained in two sworn declarations that the Department used a new program to randomize the initial ordering of petitions for the 2012 lottery. That randomizer program turned out to include a significant error: it didn't randomize. Instead, the program simply selected winning petitions in the order they had been assigned in step one, *i.e.,* almost exactly in the order they were submitted. Thus, 98% of the winning petitions were submitted on October 5 or 6. Amin explained that the 2% of winners who submitted their petitions after October 5 and 6 were selected due to a quirk in the database program that performed the initial numbering of petitions in step one, not due to a random re-ordering as required for step two. As petitions are received the program records them sequentially on a series of hard drives. But when petitions are submitted at a very high rate, the program cannot always store an incoming petition next to the previous one. Instead, it stores the new petition in a distant location and temporarily leaves a blank space next to the preceding one. Over time, the program "backfills" "these gaps in the hard drives with petitions submitted later in time." Amin Suppl. Decl. 2. Thus, the step two randomizer program merely selected petitions in the order they were stored on the hard drive, and the 2% of "winners" from later in the submission period were selected only because of the

---

**2.** We also agree with the Department's and district court's conclusion that the first lottery failed the statutory requirement that visas be issued "strictly in a random order," 8 U.S.C. § 1153(e)(2), but we need not address that issue in detail because the violation of the regulation alone justified voiding the results.

backfill process that was part of the step one numbering. No re-ranking occurred.

Smirnov argues that the agency has not demonstrated it acted reasonably because Amin's account cannot explain the results of the lottery. He points primarily to the fact that some petitions submitted on October 6 were selected even though, based on estimated submission statistics, the quota for their region should have been reached on October 5 if petitions were selected in the order they were submitted. This claim is little more than guesswork, but regardless, it is clear that these petitions could have been selected as part of the backfilling process Amin described. Contrary to Smirnov's contentions that no petitions selected from the first two days of the submission period could have been chosen due to the backfilling process, Amin's declaration simply says the temporary gaps were filled "with petitions submitted later in time." *Id.* A gap created on October 5 could have been filled later that same day, the next day, or later in the submission period. Smirnov offers no other evidence that calls into question the Department's conclusion that no step two re-ranking occurred. Based on this evidence, the agency reasonably decided to void the results of the lottery.

■ Smirnov also argues that the Department should be equitably estopped from voiding the results of the first lottery, relying primarily on an October 25, 2011 report from the Office of the Inspector General of the Department of State detailing the process that led to the computer error. The report found that the Department did not follow several internal regulations regarding information technology testing and development when implementing the new randomizer program, and that some employees developing the software did not fully understand the diversity visa process. Because the report was released after the district court dismissed the case, Smirnov filed a Rule 60(b) motion for relief from judgment, which the district court rejected. He appealed that ruling and also asked us directly to take judicial notice of the report.

The equitable estoppel argument fails for at least two reasons. First, the State Department's software development practices were at most negligent—far short of the "affirmative misconduct" required to apply equitable estoppel against the government. *See Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 191 (D.C.Cir.2009). Second, equitable estoppel requires a weighing of the equities, and were we to reallocate visa numbers back to the winners of the first lottery, the unfairness to the winners of the second lottery would be at least as grave as that to the first set of winners. Because the equitable estoppel claim lacks merit, we conclude that the district court did not abuse its discretion in denying the Rule 60(b) motion and that we need not decide whether it would be appropriate to take judicial notice of the report.

The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing *en banc*. See FED. R.APP. P. 41(b); D.C.CIR. R. 41(a)(1).